## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| COYOTE OUTDOOR LIVING, INC. | : | |
| Plaintiff, | : | |
| v. | : | Court No. 22-cv-00227 |
| UNITED STATES OF AMERICA; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; KATHERINE TAI, U.S. TRADE REPRESENTATIVE; U.S. CUSTOMS & BORDER PROTECTION; CHRIS MAGNUS, U.S. CUSTOMS & BORDER PROTECTION COMMISSIONER, | : : : : : : : | |
| Defendants. | : | |

### COMPLAINT

Plaintiff Coyote Outdoor Living, Inc. ("Plaintiff" or the "Company"), by and through counsel, alleges and states as follows:

1.      This action pertains to Defendants' prosecution of an open-ended international trade war impacting over $500 billion in imports annually from the People's Republic of China. This Complaint focuses on Defendants' unlawful escalation of that trade war through the imposition of a third round of tariffs on products covered by the so-called "List 3" and "List 4A." *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974 (Sept. 21, 2018); *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 43,304 (Aug. 20, 2019) (publishing List 4A).

2.      The Trade Act of 1974 ("Trade Act") did not provide authority to the Defendants to litigate a vast open-ended trade war for however long, and by whatever means, they should choose.  In August 2017, the Office of the United States Trade Representative ("USTR") initiated an investigation into China's unfair intellectual property and technology transfer policies and practices pursuant to Section 301 of the Trade Act (19 U.S.C. § 2411).  In accordance with Section 304 of the Trade Act (19 U.S.C. § 2414), the USTR was required to determine what action to take, if any, within 12 months after the initiation of the investigation.  However, the USTR failed to issue List 3 or List 4A within that window of time.  Significantly, the USTR may not fall back on its "modification" authority under Section 307 of the Trade Act (19 U.S.C. § 2417) to salvage List 3 or List 4A, because that statutory provision does not permit the USTR to expand the imposition of tariffs to other imports from China for reasons untethered to the unfair intellectual property and technology transfer policies and practices it originally investigated under Section 301 of the Trade Act.  Despite this fact, that is exactly what Defendants did here when they promulgated the List 3 and List 4A tariffs in response to China's retaliatory duties and other unrelated issues.  And even if the USTR deems the existing tariffs "no longer appropriate," as it also did here, the Trade Act permits the USTR only to delay, taper, or terminate the actions already taken – not to ratchet up or take new actions.

3.      The arbitrary and capricious manner in which Defendants implemented the List 3 and List 4A tariff action also violates the Administrative Procedure Act ("APA"). Violations of the APA occurred when the USTR: (1) failed to provide sufficient opportunity for comment, e.g., requiring interested parties to submit affirmative and rebuttal comments *on the same day*; (2) failed to consider relevant factors when making its decision, e.g., undertaking no analysis of the supposed "increased burden" imposed on U.S. commerce from the unfair policies and practices that it

originally investigated; (3) failed to connect the record facts to the choices it made; and (4) failed to support its modifications with substantial evidence. In fact, despite receiving over 6,000 comments, the USTR said absolutely nothing about how those comments shaped its final promulgation of List 3 and List 4A. Put simply, the USTR's predetermined decision-making bears no resemblance to the standards that the APA demands.

4.      Congress has exclusive power "to lay and collect taxes, duties, imports and excises" and "to regulate Commerce with foreign nations." U.S. Constitution, Article I, Section 8.  Pursuant to Section 301 of the Trade Act, Congress delegated authority to the USTR to take certain actions to address three types of conduct by a foreign government: (1) a violation that denies U.S. rights under a trade agreement, (2) an "unjustifiable" action that "burdens or restricts" U.S. commerce, and (3) an "unreasonable" or "discriminatory" action that "burdens or restricts" U.S. commerce. 19 U.S.C. § 2411(a)(1)(B).  However, 19 U.S.C.  § 2411(a)(1)(B) does not grant to the Executive Branch the power or authority to "raise revenue" for the general treasury – which has been set aside to  Congress by the U.S. Constitution – under the pretext of eliminating "unreasonable" or  "discriminatory" actions that allegedly "burden" or "restrict" U.S. commerce.  The public statements and *Federal Register* notices are devoid of any probative evidence that support the conclusion that the additional duties imposed on products identified on List 3 and List 4A bear any reasonable relationship to the scope of authority delegated to the USTR.

5.      The Court should set aside Defendants' actions as *ultra vires* and otherwise not in accordance with law, as well as order Defendants to refund (with interest) any duties paid by Plaintiff pursuant to List 3 or List 4A.

<u>**JURISDICTION**</u>

6.      The Court possesses subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(i)(1)(B), which confers "exclusive jurisdiction" to the Court over "any civil action

commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." 28 U.S.C. § 1581(i)(1)(B).

7.      In the alternative, the Court possesses subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(i)(1)(A), which confers "exclusive jurisdiction" over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . revenue from imports or tonnage[,]" 28 U.S.C. § 1581(i)(1)(A).

## **PARTIES**

8.      **Plaintiff** specializes in the design, development, and production of high-quality outdoor cooking equipment. Plaintiff has made numerous entries of various kinds of products that are identified on List 3 and List 4A, including, but not limited to, ones that are identified under the following subheadings of the Harmonized Tariff Schedule of the United States ("HTSUS"): 6307.90.9889, 7321.11.6000, 7321.90.6060. 8418.21.0010, 8418.99.8060, 8516.90.9000, and 9403.20.0090.

9.      Defendant United States of America received the disputed tariffs and is a statutorily required defendant under 5 U.S.C. § 702 and 28 U.S.C. § 1581(i)(1)(B).

10.      The Office of the United States Trade Representative ("USTR") is an executive agency of the United States charged with investigating a foreign country's trade practices under Section 301 of the Trade Act and implementing "appropriate" responses, subject to the direction of the President. USTR conducted the Section 301 investigation at issue and made numerous decisions regarding List 3 and List 4A.

11.     Ambassador Katherine Tai currently holds the position of USTR and serves as the Director of the Office of the USTR.  In these capacities, she has made numerous decisions relating to List 3 and List 4A.

12.     Defendant U.S. Customs & Border Protection ("CBP") is the agency that collects duties (including taxes, fees, and charges) on imports.  CBP collected payments made by Plaintiff as a result of the Section 301 tariffs imposed by USTR under List 3 and List 4A.

13.     Defendant Chris Magnus is the Commissioner of CBP.  In this capacity, he oversees CBP's collection of duties paid by Plaintiff under List 3 and List 4A.

**STANDING**

14.     Plaintiff has standing to sue because it is "adversely affected or aggrieved by agency action within the meaning of" the APA.  5 U.S.C. § 702; *see* 28 U.S.C. § 2631(i) ("Any civil action of which the Court of International Trade has jurisdiction . . . may be commenced in the court by any person adversely affected or aggrieved by agency action within the meaning of Section 702 of title 5.").  Tariffs imposed by Defendants pursuant to List 3 and List 4A adversely affected and aggrieved Plaintiff because it was required to pay these unlawful duties.  Case law is clear that Plaintiff can recover duties that were unlawfully collected because such duties do not constitute impermissible "monetary damages" foreclosed in cases based on the APA. *See, e.g.,* *Giorgio Foods, Inc. v. United States*, 35 CIT 1315, 1324-25, 804 F. Supp. 2d 1315, 1324 (2011) (*citing Bowen v. Massachusetts*, 487 U.S. 879, 893-94 (1988)). A decision by the Court, therefore, is likely to address the injury suffered by Plaintiff in the form of refunds for the duties that Plaintiff has already paid and the removal of unlawful future duties Plaintiff expects to pay on its future imports if the Court grants the relief requested herein.

15.     Plaintiff also suffered irreparable harm having been denied adequate opportunity to comment on the measures imposing tariffs on the products included in Lists 3 and/or 4A. As the

Court has recognized, "lack of procedure can constitute sufficient injury even where there exists the possibility that the agency's final decision taken in accordance with the proper procedures may not be in the plaintiff's favor." *Invenergy Renewables LLC v. United States*, 43 CIT __, __, 422 F. Supp. 3d 1255, 1272 (CIT 2019) (*citing Gilda Industries, Inc. v. United States*, 446 F.3d 1271, 1279 (Fed. Circ. 2006)).

## TIMELINESS OF THE ACTION

16.     A plaintiff must commence an action under 28 U.S.C. § 1581(i)(1)(B), "within two years after the cause of action first accrues." 28 U.S.C. § 2636(i).

17.     Plaintiff imported certain products appearing on Lists 3 and 4A. In connection therewith, Plaintiff now contests Defendants' actions that resulted in the imposition and assessment of tariffs on such products. *See generally Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974 (Sept. 21, 2018) (effective Sept. 24, 2018). Plaintiff's claims accrued when Defendants' decision was adversely applied against Plaintiff. Plaintiff files this action within two years of paying the disputed Section 301 tariffs. Alternatively, Plaintiff's claims accrued at liquidation, when the assessment of duties was final. Accordingly, Plaintiff commenced this action within the statutorily prescribed time limit.

## RELEVANT LAW

18.     Section 301 of the Trade Act authorizes the USTR to investigate a foreign country's trade practices. 19 U.S.C. § 2411(b). If such an investigation reveals an "unreasonable or discriminatory" practice, the USTR may take "appropriate" action, such as imposing tariffs on imports from the country that administered the unfair practice. *Id.* at §§ 2411(b), 2411(c)(1)(B).

19.     Pursuant to Section 304 of the Trade Act, the USTR must determine what action to take, if any, within 12 months after the initiation of the investigation. *Id.* at §§ 2414(a)(1)(B),

2414(a)(2)(B). Prior to making a determination, USTR "shall provide an opportunity (after giving not less than 30 days' notice thereof) for the presentation of views by interested persons, including a public hearing if requested by an interested person." *Id.* § 2414(b)(1)(A) (emphasis added). The legislative history demonstrates the emphasis Congress placed on obtaining the views of private parties prior to USTR making its determination. Specifically, Congress amended Section 304 of the Trade Act to "provide a minimum 30-day advance notice for the presentation of views by interested persons" to "ensure that the USTR has provided adequate opportunity for all private sector interests that may be affected by a particular section 301 action to present their views." H.R. REP. NO. 100-40, at 74.

20.     Section 307 of the Trade Act states, in pertinent part, that the USTR may "modify or terminate" an action taken pursuant to Section 301 of the Trade Act either when the "burden or restriction on United States commerce" imposed by the investigated foreign country's practice has "increased or decreased" or the action "is no longer appropriate." *Id.* at §§ 2417(a)(1)(B), (C).

## **PROCEDURAL HISTORY**

### I.     **USTR's Investigation**

21.     The current U.S.–China trade war stemmed from the Trump Administration's stated belief that U.S. companies were being adversely affected by certain Chinese laws, policies, practices, and actions relating to technology transfer, intellectual property, and innovation.  In light of such concerns, on August 14, 2017, President Trump issued a memorandum directing the USTR to consider initiating a targeted investigation pursuant to Section 301(b) of the Trade Act concerning such Chinese laws, policies, practices, and actions.  *Memorandum of August 14, 2017 – Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39,007 (Aug. 17, 2017).

22.     Subsequently, on August 18, 2017, the USTR formally initiated an investigation into "whether acts, policies, and practices of the Government of China related to technology transfer, intellectual property, and innovation are actionable under [Section 301(b) of] the Trade Act." *Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 82 Fed. Reg. 40,213 (Aug. 24, 2017).

23.     After several months, on March 22, 2018, the USTR released a report announcing the results of its investigation.  OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *Findings of the Investigation into China's Acts, Policies, And Practices Related to Technology Transfer, Intellectual Property, and Innovation Under Section 301 of The Trade Act of 1974* (Mar. 22, 2018), *available at* https://ustr.gov/sites/default/files/Section%20301%20FINAL.PDF.  In the report, the USTR concluded that certain "acts, policies, and practices of the Chinese government related to technology transfer, intellectual property, and innovation are unreasonable or discriminatory and burden or restrict U.S. commerce."  *Id.* at 17.  The USTR stated that its findings were based on, *inter alia*: (1) China's use of foreign ownership restrictions, foreign investment restrictions, and administrative licensing and approval processes to pressure technology transfers from U.S. to Chinese companies (*id.* at 45); (2) China's use of licensing processes to transfer technologies from U.S. to Chinese companies on terms that favor Chinese recipients (*id.* at 48); (3) China's facilitation of systematic investment in, and acquisition of, U.S. companies and assets by Chinese entities to obtain technologies and intellectual property for purposes of large-scale technology transfer (*id.* at 147); and (4) China's cyber intrusions into U.S. computer networks to gain access to valuable business information (*id.* at 171).  Significantly, in its report, the USTR did not quantify the burden or restriction imposed on U.S. commerce by the investigated practices.

24.     On the same date, USTR published a "Fact Sheet" stating that "[a]n interagency team of subject matter experts and economists estimates that China's policies result in harm to the U.S. economy of at least $50 billion per year." OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *Section 301 Fact Sheet* (Mar. 22, 2018), *available at* https://ustr.gov/about-us/policy-offices/press-office/fact-sheets/2018/march/Section-301-fact-sheet.   In addition, the USTR indicated that, consistent with a directive from President Trump, it would "propose additional tariffs" of 25% *ad valorem* "on certain products of China, with an annual trade value commensurate with the harm caused to the U.S. economy resulting from China's unfair policies." *Id. See also Actions by the United States Related to the Section 301 Investigation of China's Laws, Policies, Practices, or Actions Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 13,099 (Mar. 27, 2018) (hereinafter "President Trump's Directive").

## II.     List 1 and List 2

25.     Following the issuance of President Trump's Directive and through August 2018 (*i.e.*, within the 12-month statutory deadline from the initiation of the Section 301 investigation in August 2017 – *see* 19 U.S.C. § 2414(a)(2)(B)), Trump Administration trade officials undertook a series of actions to remedy the estimated harm to the U.S. economy caused by the August 14, 2017 unfair practices, ultimately imposing duties on imports of certain products from China covered by List 1 and List 2.

26.     To begin, on April 6, 2018, the USTR published notice of its intent to impose "an additional duty of 25 percent on a list of products of Chinese origin." *Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14,906, 14,907 (Apr. 6, 2018).  The products on the proposed

list covered 1,333 tariff subheadings with a total value of "approximately $50 billion in terms of estimated annual trade value for calendar year 2018." *Id.* at 14,907. The USTR explained that it chose the figure of $50 billion, because that amount was "commensurate with an economic analysis of the harm caused by China's unreasonable technology transfer policies to the U.S. economy, as covered by USTR's Section 301 investigation." OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *Under Section 301 Action, USTR Releases Proposed Tariff List on Chinese Products* (Apr. 3, 2018), *available at* https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/april/under-section-301- action-ustr.

27.     On June 20, 2018, USTR published notice of its final list of products that would be subject to an additional duty of 25% *ad valorem*, a list commonly known as "List 1." *Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710 (June 20, 2018). In the notice, the USTR explained that it had "narrow[ed] the proposed list in the April 6, 2018 notice to 818 tariff subheadings, with an approximate annual trade value of $34 billion." *Id.* at 28,711.

28.     At the same time that it issued the finalized List 1, the USTR announced that it intended to impose a 25% *ad valorem* duty on a second proposed list of Chinese products in order to "maintain the effectiveness of [the] $50 billion trade action" grounded in its Section 301 investigation. *Id.* at 28,712. The USTR announced a proposed "List 2" that included 284 tariff subheadings with "an approximate annual trade value of $16 billion." *Id.* at 28,711-12.

29.     Subsequently, on August 16, 2018, the USTR published notice of the final list of products subject to an additional duty of 25% *ad valorem* in List 2, which comprised 279 tariff subheadings whose "annual trade value . . . remains approximately $16 billion." *Notice of Action*

*Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823, 40,823-24 (Aug. 16, 2018).

**III.   List 3 and List 4**

30.   Defendants taking tariff actions under Section 301—either as an original retaliation against a foreign unfair practice, or as an increase or modification of previously instituted tariffs due to subsequent events—must comply with the statute. Only Congress has the "power to lay and collect {t}axes, {d}uties, {i}mposts and {e}xcises" and "to regulate Commerce with foreign nations." U.S. Const. Art. I § 8, Cls. 1, 3. In Section 301, Congress delegated authority to USTR to take certain actions to address "unreasonable" or "discriminatory" action by a foreign government that "burdens or restricts" U.S. commerce. 19 U.S.C. § 2411 (b)(1). This statutory authority is found in 19 U.S.C. §2411(a)(3) which provides that: "Any action taken under paragraph (1) to eliminate an act, policy, or practice shall be devised so as to affect goods or services of the foreign country in an amount that is equivalent in value to the burden or restriction being imposed by that country on United States commerce." (Emphasis added). Actions that exceed an amount that is equivalent in value to the burden or restriction are *ultra vires* agency actions or otherwise contrary to law.

31.   After the USTR announced the results of its investigation in March 2018, relations between the U.S. and Chinese governments significantly worsened.  In subsequent months, the Defendants wildly expanded the scope of the tariffs imposed under Section 301 of the Trade Act to cover imports of products from China worth more than $500 billion – a figure that was ten times higher than the amount that the USTR had deemed "commensurate" with the findings of its original investigation.  Defendants did so for reasons untethered to the unfair practices that USTR had

investigated, including countermeasures taken by China and various Trump Administration grievances concerning China's influence in world affairs.

### A.    List 3

32.    Shortly after the USTR announced in April 2018 that it was considering the potential imposition of duties on $50 billion in Chinese products, China stated that it intended to impose retaliatory duties on the same value of U.S. imports from the United States.  In response, President Trump instructed the USTR "to consider whether $100 billion of additional tariffs would be appropriate under Section 301" due to "China's unfair retaliation." THE WHITE HOUSE, *Statement from Donald J. Trump on Additional Proposed Section 301 Remedies* (Apr. 5, 2018), *available    at*   https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-additional-proposed-section-301-remedies/.

33.    Subsequently, when the USTR finalized List 1 in June 2018, President Trump again warned China that he would consider imposing additional tariffs on Chinese goods if China retaliated against the United States. *See, e.g.,* Vicki Needham and Max Greenwood, *Trump Announces Tariffs on $50 Billion in Chinese Goods*, THE HILL (June 15, 2018), *available at* http://thehill.com/homenews/administration/392421-trump-announces-tariffs-on-50-billion-in-chinese-goods (stating, *inter alia,* that "[t]he president said the United States will pursue additional tariffs if China retaliates 'such as imposing new tariffs on United States goods, services or agricultural products; raising non-tariff barriers; or taking punitive actions against American exporters or American companies operating in China.").

34.    On June 18, 2018, President Trump followed through on his warning and directed the USTR to consider whether the U.S. should impose additional duties on products from China with an estimated trade value of $200 billion notwithstanding the fact that the USTR had not yet

implemented List 1 and List 2.  President Trump acknowledged that his decision was motivated by China's threat of retaliation when he stated that "[t]his latest action by China clearly indicates its determination to keep the United States at a permanent and unfair disadvantage, which is reflected in our massive $376 billion trade imbalance in goods," and that "[t]his is unacceptable."  THE WHITE HOUSE, *Statement from the President Regarding Trade with China* (June 18, 2018), *available at* https://www.whitehouse.gov/briefings-statements/statement-president-regarding-trade-china-2/.

35.      Significantly, in keeping with the purpose of the President's directive, the USTR stated that it would design the newly proposed duties to address China's threatened retaliatory measures rather than any of the harms identified in its Section 301 investigation.  OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *USTR Robert Lighthizer Statement on the President's Additional China Trade Action* (June 18, 2018), *available at* https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/june/ustr-robert-lighthizer-statement-0 (explaining that, although Lists 1 and 2 "were proportionate and responsive to forced technology transfer and intellectual property theft by the Chinese" identified in the Section 301 investigation, the proposed duties for a third list of products were necessary to respond to the retaliatory and "unjustified tariffs" that China may impose to target "U.S. workers, farmers, ranchers, and businesses").

36.      Notwithstanding such warnings from Defendants, China retaliated by imposing 25% *ad valorem* tariffs on $50 billion in U.S. goods that would be implemented in two stages of $34 billion and $16 billion on the same dates the United States would begin collecting its own 25% tariffs under List 1 (July 6, 2018) and List 2 (August 23, 2018).

37.     Approximately one week after China imposed its first round of retaliatory duties, the USTR published a notice in the *Federal Register* in which it announced its proposal to "modify the action in this investigation by maintaining the original $34 billion action and the proposed $16 billion action, and by taking a further, supplemental action" in the form of "an additional 10 percent *ad valorem* duty on [a list of] products [from] China with an annual trade value of approximately $200 billion." *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 33,608, 33,608 (July 17, 2018).  When doing so, the USTR invoked Section 307(a)(1)(C) of the Trade Act, pursuant to which the USTR "may modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, . . . if . . . such action is being taken under [Section 301(b)] of this title and is no longer appropriate." *Id*. at 33,609 (citing 19 U.S.C. §2417(a)(1)(c)).  In its notice, the USTR initially set the following schedule: (1) deadline of August 17, 2018 for initial comments; (2) public hearings on August 20-23, 2018; and (3) deadline of August 30, 2018 for rebuttal comments. *Id*. at 33,608.

38.     In its notice, the USTR confirmed that it had relied on China's decision to impose "retaliatory duties" as the primary basis for its proposed action.  *Id*. at 33,609 (asserting as justification "China's response to the $50 billion action announced in the investigation and its refusal to change its acts, policies, and practices").  Importantly, the USTR explicitly tied the $200 billion in its proposed action to the level of retaliatory duties imposed by China on U.S. imports, noting that "action at this level is appropriate in light of the level of China's announced retaliatory action ($50 billion) and the level of Chinese goods imported into the United States ($505 billion in 2017)." *Id*.  In addition, the USTR stated that because "China's retaliatory action covers a substantial percentage of U.S. goods exported to China ($130 billion in 2017)," "the level of the

U.S. supplemental action must cover a substantial percentage of Chinese imports." *Id.* Significantly, although it pointed to China's retaliatory measures, the USTR did not identify any increased burdens or restrictions on U.S. commerce resulting from the unfair practices that the USTR had investigated. *See id.*

39.    The USTR's contemporaneous press statements also corroborated the contents of the *Federal Register* notice – that China's retaliatory duties motivated its proposed action. For example, Ambassador Lighthizer stated that the proposed action came "[a]s a result of China's retaliation and failure to change its practice." OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *Statement by U.S. Trade Representative Robert Lighthizer on Section 301 Action* (July 10, 2018), *available at* https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/july/statement-us-trade-representative.

40.    On the same date, President Trump stated that the United States' trade imbalance with China supported the decision. *See* @realDonaldTrump, TWITTER (July 10, 2018, 9:17 PM EDT), https://twitter.com/realDonaldTrump/status/1005982266496094209. Subsequently, during the following weeks, President Trump also expressed his frustration over China's purported manipulation of its currency and national monetary policy, as well as his ongoing displeasure over China's retaliatory tariffs against U.S. products and the trade imbalance between the two countries. *See, e.g.*, @realDonaldTrump, Twitter (July 20, 2018, 8:43 AM EDT), https://twitter.com/realDonaldTrump/status/1020287981020729344; @realDonaldTrump, TWITTER (July 20, 2018, 8:51 AM EDT), https://twitter.com/realDonaldTrump/status/1020290163933630464; @realDonaldTrump, TWITTER (July 25, 2018, 7:20 AM EDT), https://twitter.com/realDonaldTrump/status/1022079127799701504; @realDonaldTrump, Twitter

(July                25,                2018,                7:01                AM                EDT),

https://twitter.com/realDonaldTrump/status/1022074452999225344.   These comments built on

President Trump's June 10, 2018 comment that the United States' trade imbalance with China was

the real basis for the decision, and not the unfair trade actions at issue under Section 301. *See*

@realDonaldTrump,        Twitter        (June        10,        2018,        9:17        PM        EDT),

https://twitter.com/realDonaldTrump/status/1005982266496094209.

    41.    Shortly after such statements were made by President Trump, Ambassador

Lighthizer announced that, in light of China's retaliatory duties, the USTR would propose to

increase the additional duty from 10% to 25% *ad valorem*.  Significantly, rather than addressing

the practices that had been investigated pursuant to Section 301 of the Trade Act, Ambassador

Lighthizer attempted to justify this proposed action simply by stating that China

"[r]egrettably…has illegally retaliated against U.S. workers, farmers, ranchers and businesses."

OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *Statement by U.S. Trade Representative

Robert Lighthizer on Section 301 Action* (Aug. 1, 2018), *available at* https://ustr.gov/about-

us/policy-offices/press-office/press-releases/2018/august/statement-us-trade-representative.

    42.    Within days of making this announcement, at the direction of President Trump, the

USTR formally proposed "raising the level of the additional duty in the proposed supplemental

action from 10 percent to 25 percent." *Extension of Public Comment Period Concerning Proposed

Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to

Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 38,760, 38,760 (Aug. 7,

2018).  The USTR also set new dates for a public hearing over six days ending on August 27, 2018.

*See id.*; *see also* OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *Public Hearings on

Proposed Section 301 Tariff List* (Aug. 17, 2018) (modifying hearing schedule), *available at*

https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/august/public-hearings-proposed-section-301.

43.     In that same notice, the USTR adjusted the deadlines for the submission of written comments, setting September 6, 2018 – less than a month from the date of the notice – as the new deadline for both *initial and rebuttal* comments from the public.  83 Fed. Reg. at 38,761.  Those adjustments, which deviated significantly from past practices of the USTR, prevented both the USTR and the public from considering initial comments at the hearing, and left insufficient time for interested parties to review and respond to the initial comments filed by other parties. Compounding these problems, the USTR also limited each hearing participant to being able to provide only a maximum of five minutes of testimony. Docket No. USTR-2018-0026, https://beta.regulations.gov/document/USTR-2018-0026-0001.   Despite such obstacles, nearly 350 witnesses appeared at the hearings, and the public submitted over 6,000 comments.  *Id.*

44.     Despite the massive concerns that were expressed during the hearings and in the comments from the public, President Trump waited a mere eleven days after receiving final comments from the public before he directed the USTR "to proceed with placing additional tariffs on roughly $200 billion of imports from China."   THE WHITE HOUSE, *Statement from the President* (Sep. 17, 2018), *available at* https://www.whitehouse.gov/briefings-statements/statement-from-the-president-4/.   In his statement, President Trump again made clear that his decision was motivated by China's retaliatory response to the $50 billion tariff action by the United States (*i.e.*, the duties on List 1 and List 2 products), and he immediately promised to proceed with "phase three" of the plan – an  action that would impose an additional $267 billion in tariffs on Chinese products – "if China takes retaliatory action against our farmers or other industries." *Id.*

45.    Shortly after the President's announcement, the USTR published notice of the final list of products subject to an additional duty, a list commonly known as "List 3."  83 Fed. Reg. at 47,974.  In the notice, it was stated that a 10% *ad valorem* tariff would be imposed on all imports of products from China covered by List 3 made on or after September 24, 2018, and that the tariff rate on imports of List 3 products would automatically be increased to 25% for all entries made on or after January 1, 2019.  *Id.*  Significantly, in the notice, the USTR did not respond to any of the over 6,000 comments that it received or any of the testimony provided by the nearly 350 witnesses that had provided testimony during the six days of hearings.  *Id.*

46.    As legal support for its action, the USTR cited Section 307(a)(1)(B) of the Trade Act, which provides that USTR "may modify or terminate any action, subject to the specific direction . . . of the President . . . taken under Section 301 if . . . the burden or restriction on United States commerce of the denial of rights, or of the acts, policies, or practices, that are the subject of such action has increased or decreased."  *Id.* (brackets omitted).  The USTR further stated that the relevant burden "continues to increase, including following the one-year investigation period," adding that "China's unfair acts, policies, and practices include not just its specific technology transfer and IP polices referenced in the notice of initiation in the investigation, but also China's subsequent defensive actions taken to maintain those policies."  *Id.*  The USTR also cited Section 307(a)(1)(C) of the Trade Act, arguing that China's response to the $50 billion tariff action "has shown that the current action no longer is appropriate" because "China openly has responded to the current action by choosing to cause further harm to the U.S. economy, by increasing duties on U.S. exports to China." *Id.* at 47,975.

47.    Subsequently, in the months that followed, China and the United States attempted to resolve their differences through trade negotiations.  Based on the progress made with China in

those negotiations, the Trump Administration announced in December 2018, and again in February 2019, that it would delay the scheduled increase in the List 3 duty rate from 10% to 25%.  *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 65,198 (Dec. 19, 2018); *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 7,966 (Mar. 5, 2019).

48.     However, the trade negotiations ultimately fell apart. In May 2019, the USTR announced its intent to raise the tariff rate on List 3 goods to 25%, effective either May 10, 2019 or June 1, 2019, depending on the day of export. *See Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 20,459 (May 9, 2019) ("*List 3 Rate Increase Notice*"); *see also Implementing Modification to Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 21,892 (May 15, 2019). In the notice that was published on May 9, the USTR stated that China's decision to "retreat from specific commitments agreed to in earlier rounds" of negotiations was the basis for the increase in the Section 301 tariff rate.  *List 3 Rate Increase Notice*, 84 Fed. Reg. at 20,459.  Unlike with past imposition of new Section 301 tariffs, the USTR did not seek public comment, but rather, it simply announced that the increase would occur. *Id.*

49.     In June 2019, recognizing that imposition of Section 301 duties on List 3 products likely would cause substantial harm to U.S. companies and consumers, as well as to the U.S. economy, the USTR invited comments from parties that wished to seek exclusions from List 3 duties on a product-specific basis.  *Procedures for Requests to Exclude Particular Products From the September 2018 Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to*

*Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 29,576 (June 24, 2019). While over 30,000 exclusion requests were submitted relating to List 3 products, the USTR granted only about 5 percent of such requests which related to only 42 HTSUS subheadings. CONGRESSIONAL RESEARCH SERVICE, Section 301: Tariff Exclusions on U.S. Imports from China (Aug. 24, 2020), *available at* https://fas.org/sgp/crs/row/IF11582.pdf.  No exclusions were granted relating to any of the List 3 products imported by Plaintiff.

50.    The duties imposed on products covered by List 3 remain in effect as of the date of this Complaint, with the exception of the extremely limited number of products for which the USTR has extended its originally granted exclusions from the List 3 duties.  *See, e.g.*, *Notice of Product Exclusion Extensions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 85 Fed. Reg. 48,600 (Aug. 11, 2020).  Plaintiff continues to pay Section 301 duties on List 3 products that it imports.

**B.    <u>List 4</u>**

51.    Within a mere eight days after it published notice of its decision to increase the duty rate on imports covered by List 3, the USTR announced its intent to proceed with determining whether many more additional products from China should be subject to Section 301 tariffs, a so-called "List 4."  In its notice, the USTR stated that it planned to consider whether Section 301 duties of up to 25% should be imposed on the wide range of Chinese products covered by List 4 that collectively were worth $300 billion in annual imports.  *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 22,564, 22,564 (May 17, 2019).  The USTR explained that the proposed action being considered was

motivated by China's "retreat . . . from specific commitments made in previous [negotiating] rounds [and] announce[ment of] further retaliatory action against U.S. commerce." *Id.*

52.     Following the same process that it used in connection with List 3, the USTR invited the public to comment on the products covered by proposed List 4 and to participate in a hearing that would be held by the USTR.  *Id.* In response, the public submitted nearly 3,000 comments. Docket  No.  USTR-2019-0004,  https://beta.regulations.gov/document/USTR-2019-0004-0001. Despite the opportunity to comment, the timeline for participation in the hearing left little room for meaningful input given that the USTR required witnesses to submit drafts of their testimony by June 10, 2019, which was merely seven days before the deadline for fully developed written comments, and it again limited witnesses to five minutes of testimony at the hearing.  *Id.*

53.     Shortly after the public comments had been submitted, President Trump announced, on August 1, 2019, that the Section 301 tariffs on List 4 products would become effective September 1, 2019 at a rate of 10% *ad valorem.*  @realDonaldTrump, TWITTER (Aug. 1, 2019, 1:26 PM EDT), https://twitter.com/realdonaldtrump/status/1156979443900067841 (noting a "small additional Tariff of 10% on the remaining 300 Billion Dollars of goods and products coming from China into our Country"). In his announcement, President stated that the action was being taken as a result of China's failure to follow through on agricultural purchases and to reduce exports of fentanyl flowing into the United States.  *Id.*

54.     On August 20, 2019, USTR issued a final notice adopting List 4 in two tranches. Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 84 Fed. Reg. 43,304 (Aug. 20, 2019). To begin with, a 10% ad valorem duty on goods identified as being covered by List 4A (worth roughly $120 billion) would enter into effect on September 1, 2019.  *Id.* at 43,304.  Subsequently,

a 10% *ad valorem* duty on the remaining goods identified as being covered by List 4B (with limited exclusions "based on health, safety, national security, and other factors") would take effect on December 15, 2019. *Id.* at 43,305. Significantly, in its notice, the USTR did not address any of the nearly 3,000 comments submitted or any of the testimony provided by witnesses, other than to claim that its determination "takes account of the public comments and the testimony." *Id.*

55.     As legal support for its action, the USTR again cited Section 307(a)(1)(B) and (C) of the Trade Act, stating that it may modify its prior action taken pursuant to Section 301 of the Trade Act if (1) "[t]he burden or restriction on United States commerce" imposed by the investigated foreign country practice "has increased or decreased," or (2) "the action . . . is no longer appropriate." *Id.* at 43,304. However, instead of finding any increased burden on U.S. commerce from the practices that were the subject of its investigation, the USTR merely pointed to "China's subsequent defensive actions taken to maintain those unfair acts, policies, and practices as determined in that investigation," including retaliatory tariffs on U.S. imports, retreating from commitments during negotiations, and devaluing its currency. *Id.*

56.     Subsequently, a mere ten days later, the USTR published notice of its decision to increase the tariff rate applicable to goods covered by List 4A and List 4B from 10% to 15%. *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 45,821 (Aug. 30, 2019). The USTR explained that it increased the tariff rate because, shortly after it finalized List 4A and List 4B, "China responded by announcing further tariffs on U.S. goods." *Id.* at 45,822. In support of its position, the USTR once again cited to China's retreat from its negotiation commitments and devaluation of its currency as grounds for its action. *Id.*

57.     USTR on May 17, 2019 invited the public to seek exclusions from List 4A tariffs on

a product-specific basis. *Request for Comments Concerning Proposed Modification of Action*

*Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer,*

*Intellectual Property, and Innovation*, 84 Fed. Reg. 22,564 (May 17, 2019). On October 18, 2019,

USTR announced that starting October 31, 2019, it would accept tariff exclusion requests under

List 4. Office of the United States Trade Representative, *USTR Statement on Section 301 Tariff*

*Exclusions on Chinese Imports* (Oct. 18, 2019), https://ustr.gov/issue-areas/enforcement/section-

301-investigations/section-301-china/china-section-301-tariff.   On   October   24,   2019,   USTR

published procedures for the exclusion requests. *Procedures for Requests to Exclude Particular*

*Products From the August 2019 Action Pursuant to Section 301: China's Acts, Policies, and*

*Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg.

57,144, 57,144 (Oct. 24, 2019). The window to submit exclusion requests was from October 31,

2019 to January 31, 2020. *Id.* After receiving 8,780 exclusion requests, USTR granted 575 requests

and denied the balance without providing any basis for the divergence from the original Section

301 finding. *See* Office of the United States Trade Representative, *Index and Status of Requests for*

*Exclusion   from   $300   Billion   Trade   Action   (List   4A)*,   Docket   No.   USTR-2019-0017,

https://comments.ustr.gov/s/docket?docketNumber=USTR-2019-0017.

58.     The tariffs imposed on products covered by List 4A remain in effect as of the date

of this Complaint; the limited 87 exclusion requests for which USTR extended its originally-

granted exclusions from List 4 tariffs expired on December 31, 2020, and the USTR has only

continued to extend exclusions for certain COVID-19 related medical products. *Notice of Product*

*Exclusion Extension Amendment: China's Acts, Policies, and Practices Related to Technology*

*Transfer, Intellectual Property, and Innovation*, 85 Fed. Reg. 63,330 (Oct. 7, 2020); *Notice of*

*Product Exclusion Extensions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 86 Fed. Reg. 13,785 (March 10, 2021).

59.     On December 18, 2019, as a result of successfully negotiating a limited trade deal with China, the USTR published notice that it would "suspend indefinitely the imposition of additional duties of 15 percent on products of China covered by" List 4B.  *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 69,447, 69,447 (Dec. 18, 2019).  The USTR also stated its intent to reduce the tariff rate applicable to products covered by List 4A.  *Id.* Ultimately, in accordance with a notice that the USTR published in late January 2020 that cut in half the applicable Section 301 duty rate that would apply to List 4A products to 7.5% *ad valorem*, the action became effective on February 14, 2020.  *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 85 Fed. Reg. 3,741 (Jan. 22, 2020).

60.     Subsequently, in the months that followed, the United States and China took actions to implement the limited trade deal that they had negotiated towards the end of 2019.  OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *United States and China Reach Phase One Trade Agreement* (Dec. 13, 2019), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2019/december/united-states-and-china-reach. During that time, Defendants declined to impose additional duties on imports covered by List 4B, presumably because China had agreed to some new, unrelated obligations under the limited trade deal.

61.     President Trump publicly confirmed that the China tariffs have generated a significant amount of revenue for the U.S. government. "Billions of dollars are pouring into the coffers of the U.S.A. because of the tariffs being charged China … Otherwise let's just make our

country richer than ever." Tweet from @realDonaldTrump, November 29, 2018, https://twitter.com/realDonaldTrump/status/1068120444279103488. In an interview, President Trump touted that the U.S. Government is "collecting tens of billions of dollars of tariffs from China," of which "we're giving $16 billion out of all the tariffs that we're collecting [to U.S. farmers]." WTMJ-TV July 12, 2019 Interview with President Trump, *available at* https://www.youtube.com/watch?v=xFfsDj9Lhds (last accessed November 16, 2020).

62.     USTR has never explained or provided evidence how the List 3 or List 4A additional duties were related to the subject of the 301 Investigation: China's policies and practices regarding intellectual property and technology transfer. President Trump's and others' statements characterize the List 3 and List 4A additional duties as generating revenue for the U.S. Treasury.

63.     The Section 301 duties imposed on products covered by List 4A remain in effect as of the date of this Complaint.

64.     On September 16, 2020, a dispute settlement panel of the World Trade Organization ("WTO") ruled that the Section 301 tariffs imposed by the United States on imports from China are inconsistent with the United States' obligations under the General Agreement on Tariffs and Trade ("GATT").

## STATEMENT OF CLAIMS

## COUNT ONE

## (DECLARATORY JUDGMENT – VIOLATION OF THE TRADE ACT OF 1974)

65.     Paragraphs 1 through 64 are incorporated by reference.

66.     The Declaratory Judgment Act authorizes any court of the United States to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

67.     The Trade Act of 1974 does not authorize the actions taken by Defendants that resulted in the List 3 and List 4A tariffs.

68.     Congress has the exclusive "power {t}o lay and collect {t}axes, {d}uties, {i}mposts and {e}xcises" and "to regulate Commerce with foreign nations." U.S. CONST. art 1 § 8; *see also Arjay Assocs., Inc. v. Bush*, 891 F.2d 894, 896 (Fed. Cir. 1989).

69.     Pursuant to Section 301 of the Trade Act, USTR may impose tariffs when it determines that "an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce, and action by the United States is appropriate." 19 U.S.C. § 2411(b).  The USTR failed to predicate its action giving rise to List 3 and List 4A on any such determination.

70.     Section 301 of the Trade Act of 1974 prescribes the exact circumstances of when and how USTR may take action to address "unreasonable" or "discriminatory" trade practices. These statutorily mandated procedures are binding, especially where they govern the delegation of an enumerated power of the Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587-88 (1952) ("{T}he Constitution is neither silent nor equivocal about who shall make laws . . . '{a}ll legislative Powers herein granted shall be vested in a Congress of the United States.'" (internal citation omitted)). The Constitution expressly and clearly confers all taxing authority to Congress, including on imports.  Any delegation of this authority to USTR must be conservatively interpreted within the narrow bounds set forth in the statute.

71.     If the USTR concludes upon investigation that a foreign country maintains an unfair trade practice, Section 304 of the Trade Act requires the USTR to "determine what action, if any," to take within "12 months after the date on which the investigation is initiated." 19  U.S.C. § 2414(a)(1)(B), (2)(B). The USTR's action giving rise to List 3 occurred in September 2018, over

a year after the USTR initiated the underlying Section 301 investigation on August 18, 2017. Moreover, the USTR's actions giving rise to List 4A occurred in August 2019, over two years after the USTR initiated the underlying Section 301 investigation on August 18, 2017.

72.     Section 307 of the Trade Act authorizes USTR to "modify or terminate" an action taken pursuant to Section 301(b) of the Trade Act when the burden imposed on U.S. commerce from the foreign country's investigated unfair acts, policies, or practices increases or decreases. 19 U.S.C. § 2417(a)(1)(B).  Section 307 of the Trade Act, however, does not permit Defendants to increase tariffs for reasons unrelated to the acts, policies, or practices that the USTR investigated pursuant to Section 301 of the Trade Act.  Congress did not authorize the USTR to escalate its focused investigatory findings into an unending trade war.

73.     Furthermore, the USTR exceeded the authority delegated to it under Section 301 by acting outside of mandatory time constraints. Section 301 is unambiguous – the USTR has 12 months to determine what action, if any, it should take under Section 301.  The USTR's actions giving rise to List 3 and List 4A occurred in September 2018 and August 2019, respectively, well over a year after the USTR initiated the underlying Section 301 investigation on August 18, 2017. The USTR, therefore, violated Section 301 by acting outside of mandatory time constraints.

74.     Section 307 of the Trade Act also authorizes the USTR to "modify or terminate" an action taken pursuant to Section 301(b) of the Trade Act if the initial action taken by USTR "is no longer appropriate." 19 U.S.C. § 2417(a)(1)(C).  However, Section 307 of the Trade Act does not authorize Defendants to *increase* tariff actions that are no longer "appropriate," but rather only to delay, taper, or terminate such actions.

75.     Defendants imposed additional Section 301 tariffs under Lists 3 and 4A that were not equivalent in value to the burden or restriction being imposed, and were thus beyond the authority conferred to Defendants.

76.     The WTO recognized USTR failed to connect its actions underlying List 3 to the harm identified in its initial Report. On September 15, 2020, the WTO released its panel opinion in response to China's challenge to the imposition of 301 tariffs based on "the United States measures, imposing additional ad valorem duties on certain products imported from China, pursuant to the findings of an investigation {USTR} carried out into China's acts, policies, and practices related to technology transfer, intellectual property, and innovation under Section 301{}." Panel Report, United States — Tariff Measures on Certain Goods from China, ¶ 1.1, WTO Doc. WT/DS543/R (adopted Sept. 15, 2020), *available at* https://www.wto.org/english/tratop_e/dispu_e/543r_e.pdf. The WTO concluded the duties implemented under List 3[1] "do not seem to concern products that have allegedly benefitted from China's practices and policies documented in the Section 301 Report." *Id.* at ¶ 7.217; *see also id.* at ¶7.222 ("In this context, the United States has not adequately explained how there is a genuine relationship of ends and means between the imposition of additional duties on List 2 products and the public morals objective as invoked by the United States.").

77.     Plaintiff is therefore entitled to a declaratory judgment that Defendants' actions giving rise to List 3 and List 4A are *ultra vires* and contrary to law.

## COUNT TWO

## (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT)

78.     Paragraphs 1 through 77 are incorporated by reference

---

[1] The WTO Report refers to this action as "List 2," but this is in reference to the List 3 tariffs detailed within this complaint that USTR imposed on September 21, 2018. *Id.* at ¶ 2.2.

79.     The APA authorizes the Court to hold unlawful and set aside agency action that is: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence."  5 U.S.C. § 706(2).

80.     The USTR took final agency action subject to review under the APA in implementing tariffs on Lists 3 and 4A.

81.     Defendants exceeded their authority under the Trade Act in promulgating List 3 and List 4A and therefore acted contrary to the U.S. Constitution, "not in accordance with the law," and "in excess of statutory authority" for the reasons set forth in Count One.

82.     The APA clearly requires an agency engaging in rulemaking to give public notice in the Federal Register and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b)-(c). USTR engaged in rulemaking when implementing tariffs on products subject to Lists 3 and 4A.  *See Invenergy*, 422 F. Supp. 3d at 1285 (noting that "modification to the HTSUS is indicative of the determination that these actions are rulemakings"). Under the APA, as codified under 5 U.S.C. § 553, "[w]hen rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection." *Id.*   Section 301 dictates that USTR's determination, namely the decision to implement tariffs on the products under Lists 3 and 4A, must be made on the record providing the opportunity for the "presentation of views" by interested parties.  *See* 19 U.S.C. § 2414(b)(1)(A), (c) (requiring that USTR hold a hearing if requested by an interested person prior to making its determination and "publish in the Federal Register any determination made").

Because a hearing is required, 5 U.S.C. § 557 dictates that "the parties are entitled to reasonable opportunity to submit for the consideration of the employees participating in the decisions — proposed findings and conclusions; or . . . supporting reasons for the exceptions or proposed findings or conclusions." *Id.* § 557(c)(1), (3) (emphasis added).

83.     For List 3 and List 4A, Defendants failed to offer any evidence for any asserted "increased burden" from China's technology transfer, intellectual property, and innovation policies and practices that were the subject of the USTR's Section 301 investigation for the reasons set forth in Count One.

84.     Defendants also promulgated List 3 and List 4A in an arbitrary and capricious manner because they did not provide a sufficient opportunity for comment, failed to meaningfully consider relevant factors when making their decisions, and failed to adequately explain their rationale. Defendants' preordained decision-making resulted in the unlawful imposition of tariffs on imports covered by List 3 and List 4A whose value equals $300 billion.

## COUNT THREE

### (VIOLATION OF THE UNITED STATES CONSTITUTION)

85.     Paragraphs 1 through 84 are incorporated by reference.

86.     Public and repeated statements made by President Trump and other officials in the Trump Administration confirmed that an additional—and likely driving—reason for the List 3 and List 4A additional duties was to collect revenue for the federal general treasury.

87.     To the extent the List 3 and List 4A additional duties were revenue collection measures, they were beyond the scope of actions USTR was authorized to take by the Trade Act of 1974 and, therefore, were unlawful.

88.     To the extent the List 3 and List 4A additional duties were implemented for the purposes of collecting revenue for the U.S. government, they were unconstitutional, because only

Congress has the constitutional power to "lay and collect taxes, duties, imposts and excises." U.S. Constitution, Article 1, Section 8, Clause 1.

## COUNT FOUR

### (VIOLATION OF THE UNITED STATES CONSTITUTION)

89.     Paragraphs 1 through 88 are incorporated by reference.

90.     The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "No person shall… be deprived of life, liberty, or property, without due process of law."

91.     Defendants promulgated List 3 and 4A in violation of the Due Process Clause when they failed to provide a sufficient opportunity for comment, failed to meaningfully consider relevant factors in making their decisions, and failed to adequately explain their rationale. Defendants' predetermined decision-making resulted in the unlawful imposition of tariffs on imports covered by Lists 3 and 4A whose value equals $500 billion.

## COUNT FIVE

### (VIOLATION OF GATT AND THE CHARMING BETSY CANON)

92.     Paragraphs 1 through 91 are herein incorporated by reference.

93.     Article XX(a) of the GATT allows a member to "adopt or enforce" measures, "necessary to protect public morals," subject to the requirement that "such measures are not applied in a manner which would constitute a means of arbitrary or unjustifiable discrimination between countries where the same conditions prevail, or a disguised restriction on international trade."

94.     The "Charming Betsy" canon – the judicial presumption that an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains – counsels against interpreting federal statutes to contravene international law. *Murray v. The Schooner Charming Betsy*, 6 U.S. 64 (1804).

95.     Defendants promulgated List 3 and 4A in violation of Articles I:1 and II:1(a) and (b) of the GATT 1994 and the Charming Betsy canon when they imposed tariffs on imports covered by Lists 3 and 4A in excess of those provided in the U.S. Schedule of Concessions and Commitments (as annexed to the GATT 1994). The tariffs are not justified by any of the exceptions set forth in the GATT 1994, including GATT Article XX(a).

* * *

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

(1)     declare that Defendants' actions resulting in tariffs on products covered by List 3 and List 4A are unauthorized by, and contrary to, the Trade Act;

(2)     declare that Defendants arbitrarily and unlawfully promulgated List 3 and List 4A in violation of the APA;

(3)     declare that List 3 and 4A are unconstitutional;

(4)     vacate the List 3 and List 4 rulemaking;

(5)     order Defendants to suspend liquidation of all unliquidated entries covering the products at issue imported by Plaintiff and subsequently to liquidate the entries in accordance with the Final Order in this case;

(6)     order that the liquidated entries subject to unlawfully and/or unconstitutionally assessed duties be re-liquidated;

(7)     order Defendants to refund, with interest, any duties paid by Plaintiff pursuant to List 3 and List 4A;

(8)     permanently enjoin Defendants from applying List 3 and List 4A against Plaintiff and collecting any duties from Plaintiff pursuant to List 3 and List 4A;

(9)     award Plaintiff its costs and reasonable attorney fees; and

(10)   grant such other and further relief as may be just and proper.

Respectfully submitted,

Dated:  July 29, 2022

**/s/ Geoffrey M. Goodale**
Geoffrey M. Goodale
Brian H. Pandya
J. Manly Parks
Brian S. Goldstein
Nathan J. Heeter
DUANE MORRIS LLP
505 9th Street, NW – Suite 1000
Washington, D.C. 20004
Tel: (202) 776-5211
E-mail: GMGoodale@duanemorris.com

*Counsel to Coyote Outdoor Living, Inc., Plaintiff*